JOSÉ CORDOVA, JR., *v.* THE STATE.

1. GRAND JURY — RIGHT OF CHALLENGE. — Defendant moved to quash the indictment because, at the time the grand jury was organized, he was confined in jail, and not brought into court or afforded an opportunity to challenge any of the grand jurors; but the motion did not allege the existence of any cause of challenge specified in the Code. *Held,* as heretofore decided in *Thomason* v. *The State,* 2 Texas Ct. App. 550, that the court below correctly overruled the motion.

2. CONSTITUTIONAL LAW — TERMS OF DISTRICT COURTS. — An ordinance of the Constitutional Convention of 1875 fixed the terms of the Bexar District Court for the fourth Mondays in April and October, until otherwise provided by law. The Constitution of 1876 empowers the Legislature to provide for more than two terms in any county. It prohibits, however, the enactment of any "local or special law," without previous publication, for thirty days, of notice that such a law will be applied for. On May 30, 1876, without such previous publication, an act was passed which provided that five terms of the District Court of Bexar County should be held, and specified the times therefor. *Held,* that this act is not a "local or special law" in the sense used in the said constitutional prohibition, but is an enactment within the constitutional power of the Legislature.

3. SAME. — Unless clearly and undoubtedly repugnant to the Constitution, an act of the Legislature will be reconciled therewith and be sustained by the courts. And in expounding the Constitution, such a construction will be employed as will prevent any clause, sentence, or word from being super-

fluous, void, or insignificant. Contemporaneous legislative construction of constitutional provisions is entitled to much weight.

4. SAME — GENERAL ACTS. — To make a statute a public law of general obligation it is not necessary that it applies equally to all parts of the State, provided it applies equally to all persons within the territorial limits described in it.

5. PETIT JURORS. — The jury-law of 1876 authorizes the sheriff or his deputy, in summoning persons drawn to serve as petit jurors, to do so by giving personal notice, or by leaving a written notice at the juror's residence with a member of his family over sixteen years of age. But it would be better practice in capital cases to summon in person, if practicable, the persons named in the special *venire*.

6. SEAL OF COURT. — Defendant moved to quash a special *venire* because the seal upon it bore the legend, "District Court, Bexar County," instead of "District Court of Bexar County," as directed by law. *Held*, properly overruled, the seal being in substantial compliance with the law.

7. PRACTICE. — Defendant in a capital case is not entitled to be present in court when the special *venire* is drawn.

8. SAME. — ARRAIGNMENT of a defendant in a capital case ought to precede the trial before the jury; but if the record shows that it was done, but at an improper time, a conviction will not be set aside on that account.

9. SAME. — Defendant having had the State's witnesses put under the rule, he objected to one of them testifying who was not put under the rule until he had heard part of the testimony of the first witness for the State. *Held*, that the enforcement of the rule is committed to the discretion of the presiding judge, and its infraction by a witness is not material error, when it does not appear that the defendant was prejudiced thereby.

10. EVIDENCE. — In a trial for murder, the circumstances indicated that the deceased had been waylaid, robbed, and assassinated. The State was allowed to prove that he received a considerable amount of money the day previous to his assassination. *Held*, competent evidence to show a motive for the crime.

11. SAME. — See the opinion in this murder case for collateral circumstances which, though not ostensibly inculpating the accused, are held, in view of other facts before the jury, to have been properly admitted in evidence for the State.

12. SAME. — Acts and conduct of a defendant in arrest, either before or after being accused of the crime, may, though not *res gestœ*, be competent evidence against him as indicative of a guilty mind.

13. MINUTES OF COURT. — An order overruling a motion for a new trial recited that the defendant appeared by attorney, but nowise negatived his personal presence when his motion was heard and determined. *Held*, that no error is deducible from the entry.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

On October 20, 1877, the grand jury of Bexar County returned into the District Court an indictment charging the appellant, his father, José Cordova, Sr., Henrique Diaz, and Merced Sancedo, *alias* Morales *alias* Cordova, with the murder of Robert Trimble, on July 7, 1877, by stabbing him in the breast with a knife, or other sharp instrument.

At the December term, 1878, the appellant, José Cordova, Jr., was put upon his trial alone. The evidence against him was entirely circumstantial, but of so conclusive a nature that the jury found him guilty of murder in the first degree ; and the court, after overruling his motion for a new trial, passed judgment of death, according to law. His defence was ably conducted by Messrs. Berry, Rosenheimer, and S. G. Newton, who interposed various motions, and a plea to the jurisdiction, the character of which is clearly disclosed in the opinion of the court.

The first witness for the State was John Trimble, a brother of the deceased. It appears from his testimony that he and the deceased lived within half a mile of each other, in Medina County, which adjoins the county of Bexar, in which the assassination was perpetrated. The witness testified that Robert Trimble, the deceased, was younger than himself. Witness last saw him alive on the morning or Saturday, July 6, 1877, when he (the deceased) left his home in Medina County, with a two-horse wagon load of corn, drawn by two mules, for the purpose of taking it to San Antonio and bringing back some family supplies. On the 10th of the same month witness saw his corpse in Bexar County, on the north side of the Frio Road. There were two stabs over his heart, and a bullet had passed through his vest, without penetrating his body. A stake-rope was tied around his leg, and his body had evidently been dragged some distance to the spot where it was found. The wagon driven by the deceased was the property of witness, and was borrowed by the deceased on the morning of July 6, 1877, when witness last saw him alive. It was a

Whitewater wagon, which witness had purchased in the pre-
ceding spring, and which witness knew well by certain re-
pairs he had put upon it, and by other distinctive marks,
which he described. A few days after the murder the
wagon was brought back to witness, considerably defaced
and damaged. The name " Whitewater " on its side had
been rubbed out, and Mexican brands made with tar were
on the bands of the wheels ; the feed-trough had been taken
from it, the pole broken and pieced, the brake broken off,
and the name " Whitewater," on the hind axle, partly
marked out. In the wagon, when it was returned to wit-
ness, was a piece of domestic containing four yards, with
blood on one corner of it ; also, part of a sack of flour, and
a package of sugar with blood on it. About sixty-eight
yards from where the corpse was found, witness picked up
a memorandum, in his sister's handwriting, calling for four
yards of domestic, a sack of flour, twenty-five pounds or
sugar, and a pair of ladies' shoes. The mules and harness
with which the deceased started to San Antonio were his
own. On Monday, the 8th of July, 1877, two days after
he left, the mules were back in the neighborhood, and
this caused witness to apprehend that some accident had
befallen his brother ; and he, with three men, came to San
Antonio on that day. From there he went to Indian Creek,
and there struck a wagon-trail which left the main Frio
Road ; but, as it was then getting too dark to follow it, wit-
ness left it for the night, returned the next day, and the
corpse of the deceased was found about sixty-eight yards
from it, at a spot to which it had evidently been dragged
from the wagon-trail. The defendant had once worked for
the deceased. The harness was also brought back, and
witness knew it to be the same the deceased used on the trip
to San Antonio.

David Young, for the State, testified that he had seen
Robert Trimble, and last saw him alive on the morning of
July 7, 1877. Witness afterwards searched for his body,

and went to John Trimble's to get the measure of the wagon-track. There he noticed that there was a bend in it, about every fifteen feet. From there he took the Frio and San Antonio Road, and about a mile and a quarter from Indian Creek, towards San Antonio, he saw a wagon-track running off from the road, and recognized it as the track of the wagon driven by the deceased. He followed it some two hundred yards, and observed a trail leading away from it, which looked as though some thing had been dragged on it. Following this trail some sixty yards, he came to the dead body of a man. Leaving a negro boy in charge of the body, he brought up John Trimble and Robert Ragsdale. John Trimble remained with the body, and witness and Ragsdale pursued the wagon-track. At a distance of about three-fourths of a mile it entered the Frio Road, and took the San Antonio end of it. Finding no similar track entering the city on the Frio Road, they took a circle around the city, and found the track near the cock-pit, but could only follow it about twenty feet. Learning that arrests had been made at Uvalde, witness and the others proceeded there on the night of July 11, 1877, and there found a wagon which was identified as the Trimble wagon. Its track was identical with that found near the body of the deceased. Witness gave a similar description of the wagon as that which John Trimble gave of its appearance when returned to him. On his cross-examination, witness would not positively swear that this was the wagon which made the track near the body, but he believed it was. Witness did not notice blood on the sacks found in it, but did notice the grasp of a bloody hand upon one of the wagon-bows, and blood upon the tongue. On the morning of July 7, 1877, witness saw Feliciano Cordova (a young brother of the defendant) go out the road near which the corpse was found.

T. M. McDaniel, for the State, testified that he lived in Medina County, and knew Robert Trimble, the deceased.

The day the deceased came to San Antonio (July 6), witness gave him $207 in currency, with which to buy a piece of land. This evidence was admitted over objections by the defence, and exceptions were reserved.

L. M. Temple, for the State, testified that in July, 1877, he was a member of Dolan's company of Rangers, ten or twelve of whom were below the town of Uvalde on the 12th of that month, and that on that day, and three miles below that town, he first saw the defendant, with whom, travelling in a Whitewater wagon, on the old Fort Inge Road, were an old man and an old woman. Two other young men, one of whom had a wooden leg, were of the defendant's party, on horseback, and in advance of the wagon. The defendant and the other two persons in the wagon, and the two young men, were arrested by the Rangers, who had been notified by telegraph of the murder of Robert Trimble, and of the approach of the defendant and his party in a wagon, of which the telegram gave a description corresponding with that of the wagon in which they were travelling. All of the Rangers, except witness and another, were detached elsewhere, and he and his comrade started to the town of Uvalde with the arrested parties. Witness took charge of the defendant and the two old people in the wagon, and his comrade, with the two young men, followed in the rear. On the way to the town the defendant shot witness, jumped out of the wagon, and fired at the other Ranger. He and the two young men escaped. This was within a quarter of a mile of the town, to which the witness and his comrade proceeded with the wagon and the two old people. The old Fort Inge Road is a plain road, but not much travelled.

On his cross-examination, the witness identified José Cordova, Sr., as the old man who was in the wagon, and Henrique Diaz as the wooden-legged boy. Both the old man and the defendant spoke English well. When witness was shot he was riding in advance. He was stunned, but

looked back and saw the defendant, with his rifle in his hand, level it at some one in the rear, and witness heard the report of it, but saw nothing. Near Uvalde, witness fell off his horse.

T. M. Paschal, for the State, testified that on the 12th of July, 1877, he was in the town of Uvalde, and there saw a Whitewater wagon, and in it an old Mexican. The wagon answered in every particular the description which witness had obtained of the Trimble wagon. Witness recognized José Cordova, Sr., as the old Mexican who was in it. Witness saw Temple just after he was shot, and heard the firing when it was done. The old Fort Inge Road is but little used, and there are no settlements on it; and by it the Eagle Pass Road, to Mexico, can be reached without going through the town of Uvalde.

F. Niggli, for the State, testified that he was sheriff of Medina County. After the escape of the defendant from the Rangers, witness and others went to Mexico, and, with an escort of Mexican soldiers, went in pursuit of the defendant. They got in sight of him and two companions, and caught their horses, but failed to get the defendant at that time. Five or six months afterwards, however, witness found him in the jail at Piedras Negras, in Mexico.

Robert Ragsdale, for the State, testified that he had long known the deceased, and had often used the wagon he had driven on his last trip to San Antonio, which he described in similar terms to those of other witnesses. He saw the corpse of the deceased on July 10, 1877, where it was found, about a mile from Indian Creek, and about a hundred and fifty yards from the road. Witness was along with David Young most of the time, in search for the murderers, and added nothing material to Young's testimony.

W. C. Shelton, for the State, testified that he lived, in July, 1877, at Adams's ranch, fifteen miles from San Antonio, on the road thence to Castroville, the county-site of Medina County. On the 9th of that month he saw a

wagon pass, drawn by a dun, roached, mare pony and a bay horse. Two persons were riding on horseback along with it. They were Mexicans. A wagon-sheet covered the wagon, so that witness could not see its occupants.

W. Kelso, for the State, testified that on the 8th or 9th of July, 1877, at the San Lucas Springs, a watering-place on the road from San Antonio to Castroville, he saw several Mexicans, of whom an old man, an old woman, and another person were riding in a wagon, and two boys on horseback. Witness has seen and recognized the Cordovas as some of the party, and Henrique Diaz, a wooden-legged boy, as one of them. They loaned witness a bucket with which to water his horse; and the old man, who was driving the wagon, told witness he was in a hurry. Their team was a dun, roached, mare pony and a bay horse.

Sam Taylor, for the State, testified that in 1877 he lived on the west side of the San Pedro Creek, in San Antonio. He knew Robert Trimble, the deceased, and also his mules. The deceased always stayed at witness's house when he came to town. The last time witness saw him was the day of his death, — meaning, doubtless, Sunday, July 7, 1877. His mules took fright and ran away, and were caught and brought back by two Mexicans. This was about twelve or one o'clock, and about the latter hour the deceased started for home. Witness did not know the Mexicans who caught the mules; and could not say whether he had ever seen the defendant prior to the trial. A quantity of money rattled in Trimble's pockets, and witness told him to take it out and wrap it up.

Henry Rucker, for the State, testified that in 1877 he lived west of the Alazan ditch, which is in the western suburb of San Antonio. Witness did not know the defendant, but did know the deceased, and also the wooden-legged Mexican boy, who lived near witness, but whom witness had not seen since Trimble's death. The night of the Sunday, in July, 1877, when Trimble was killed, there was music and

dancing at old man Cordova's, and about twelve or one o'clock witness got up and went to look. By the light in Cordova's house, witness saw near it a two-horse wagon, with a sheet on it. At nine or ten o'clock that same evening there was no wagon at Cordova's. The next morning all were gone from Cordova's house, and the wagon also. Nothing was left in the house.

Lealy Rucker, wife of the last witness, testifying for the State, corroborated her husband's evidence. She stated, further, that she saw the deceased's mules when they ran away and were brought back by some Mexicans, who then went into a house in the neighborhood, in which Henrique Diaz, the wooden-legged boy, lived.

Eli Cole, for the State, testified that on Saturday, July 7, 1877, he saw the deceased in San Antonio, and sold him a sack of flour. Witness did not know what articles the deceased had in his wagon.

Mariano Garcia, for the State, testified that he knew the defendant and his family, some of whom live in Mexico. In 1877 the defendant lived in San Antonio. Henrique Diaz is a grandson of old Cordova, and a nephew of the defendant. In December, 1877, witness arrested the defendant in Mexico, and brought him back to San Antonio.

Besides these witnesses, whose testimony has been greatly condensed, the State introduced others, and elicited other circumstances than those already detailed. The theory of the prosecution was, that the deceased was killed on Sunday, July 7, 1877, while on his way home from San Antonio; that his wagon was brought that night to old Cordova's, in San Antonio, who, with his wife, sons, and grandson, started with it the next morning for Mexico; that they mutilated and defaced the wagon to prevent its recognition, and resorted to an unused route to avoid observation and detection. No single circumstance tended, in the slightest degree, to inculpate any one other than the several parties indicted; and even the evidence adduced by the defendant must, as will be seen, have strongly conduced to confirm their guilt.

Pancho Charles, the first witness for the defence, testified that he lived in San Antonio in July, 1877, and saw the defendant on that day. Witness could not say that defendant had a wagon on that day, but saw him, on the 5th of that month, buy a wagon from Antonio Garcia. He gave for it a horse and $10. Felipe Lopez, Gregorio Anton, and witness were present at the trade. Witness went to where it was made when he was hunting his cows.

On his cross-examination, witness said he knew the trade was made on the 5th of July, because it was the next day after the 4th, when there was a celebration in San Antonio. He did not see any thing paid by the defendant, but saw him deliver the horse. Defendant then lived in San Antonio, west of the Alazan ditch. Witness did not know where Anton and Lopez were at the time of the trial, and had not seen them since the trade was made; but he knew them well. Could not say how many wheels the wagon had, nor whether it was a horse-wagon or an ox-wagon; saw no sheet, bows, or harness. The trade was made on the Alazan ditch, but he did not know on which side of it. Saw no bill of sale of the wagon. Never saw Antonio Garcia before or since the trade. Knew nothing about the trade, except what he was told by the parties, and seeing the delivery of the horse. Did not see the defendant after it was made. Witness is his brother-in-law, his wife being defendant's sister. Gregorio Anton and the defendant told witness that defendant had purchased the wagon from Antonio Garcia.

José Cordova, Sr., who was one of the indicted parties, was introduced for the defence, though the record does not explain how he had been exonerated of the charge and qualified to testify. He stated that the defendant purchased the wagon from Antonio Garcia, who brought it to the defendant's house on the 8th of July, 1877. It was the same wagon with which witness and his family started to Mexico. They left five days after it was purchased; but he adds that it was on Sunday afternoon, which must have been the 14th of the month. Defendant was driving when the party were

arrested. Witness was asleep at the time, but awoke when the shooting began, and found that the boys were gone. Witness never saw the wagon until it was brought to his house by Antonio Garcia, and never saw Antonio Garcia but on that occasion. Defendant was at witness's house from the 4th of July until the wagon was delivered. Witness denied positively that he saw Ferdinand Niggli in Uvalde, on the 12th or 13th of July, 1877, or ever told him that he (witness) was the owner of the wagon, and was carrying the rest of the party to Mexico for pay, but did not know any of them. He also positively denied that he told John C. Sullivan, at Uvalde, on the 12th or 13th of July, 1877, that he (witness) did not know where the defendant and Feliciano got the wagon, but that they brought it to his house at night. Witness stated that his object in going to Mexico was to visit some of his children who lived there.

Clemente Dun, for the defence, testified that he knew the defendant and his family, and their object in starting to Mexico, which was to live there. They had been preparing to leave for two or three months. Defendant had been working for witness for one month. Witness is a brother-in-law of the defendant. This concluded the evidence for the defence.

Ferdinand Niggli, recalled by the State, testified that he saw old man Cordova in Uvalde, when the latter was in arrest there, in July, 1877, and he then told witness that the wagon and harness belonged to him (Cordova), and that he was taking the rest of his party to Eagle Pass for eight or ten dollars, but did not know who they were. Afterwards, however, he told witness who they were.

John C. Sullivan, recalled by the State, testified that he asked old man Cordova, when at Uvalde, where he got the wagon and horses, and he said he did not know,—that his sons, José and Feliciano, brought them to his house the night they left San Antonio.

L. M. Temple, recalled by the State, contradicted old

·Cordova's statement that he was asleep when his party were arrested. The opinion discloses all other matters of ·significance.

No brief for the appellant.

*Thomas Ball*, Assistant Attorney-General, and *W. B. Dunham*, for the State.

Ector, P. J. The defendant in this case, José Cordova, Jr., was jointly indicted with José Cordova, Sr., Henrique Diaz, and Merced Sancedo, *alias* Morales, *alias* Cordova, on the twentieth day of October, 1877, for the murder of Robert Trimble, on the seventh day of July, 1877. He was tried separately, at the December term, 1878, of the court, convicted of murder in the first degree, and has appealed the case to this court.

Many objections have been urged against the rulings of the court on the trial, which are properly presented in bills of exception and assignments of error. Counsel for defendant in the court below contested every point that ·could possibly arise during the trial, and, judging from the record before us, did their whole duty in defence of their client.

On the trial in the District Court, the defendant filed a motion to quash the indictment, for the following reasons, to wit : —

" 1. Because the indictment herein was not found by a grand jury empanelled according to law, at a term of the District Court of Bexar County, in this : that at the time the grand jury were empanelled this defendant was confined in the county jail of Bexar County, and was not produced in open court to challenge any of the grand jurors so empanelled, nor was he granted the privilege of exercising the right to challenge the grand jurors so empanelled, as is authorized under the law.

" 2. Because it was not presented in a court having juris-

diction of the offence therein charged, because this is not a legal term of the District Court of Bexar County, the Constitution having provided for only two terms of the court in this county, not corresponding with the time this court is being held, and there has not been any lawful legislative change of said constitutional time."

We think the court properly overruled the motion to quash the indictment. The motion fails to state any cause of challenge, either to the array or to any member of the grand jury, if he had been present in court at the time the jury was empanelled; or that defendant was deprived of any legal right. The exact question raised in the first ground in the motion to quash has been passed upon by this court in the case of *Thomason* v. *The State*, 2 Texas Ct. App. 550.

The second ground in the motion raises the question of the constitutionality of the act of May 30, 1876, which prescribes the times of holding the District Courts in the Twenty-second Judicial District, Bexar being one of the counties composing said district.

An ordinance passed by the Convention of 1875, which framed our present State Constitution, fixed the terms of holding the District Court in the county of Bexar to the fourth Mondays in April and October, until otherwise provided by law. Art. 5, sect. 7, of the Constitution reads as follows: "The State shall be divided into twenty-six judical districts, which may be increased or diminished by the Legislature. For each district, there shall be elected by the qualified voters thereof, at a general election for members of the Legislature, a judge, who shall be at least twenty-five years of age, shall be a citizen of the United States, shall have been a practising attorney or a judge of a court of this State for a period of four years, and shall have resided in the district in which he is elected for two years next before his election; * * * and shall hold the regular term of court at one place in each county

twice in each year, in such manner as may be prescribed by law. *The Legislature shall have power, by general act, to authorize the holding of special terms, when necessary, and to provide for holding more than two terms of the court in any county*, for the despatch of business." * * * [The italics are our own.]

Art. 3, sect. 57, of the Constitution is as follows: " No local or special law shall be passed, unless notice of the intention to apply therefor shall have been published in the locality where the matter or thing to be affected may be situated, which notice shall state the contemplated law, and shall be published at least thirty days prior to the introduction into the Legislature of such bill, and in the manner to be provided by law. The evidence of such notice having been published shall be exhibited in the Legislature before such act shall be passed."

The defendant claims that the act of the Legislature which gives five terms of the District Court to Bexar County is in contravention of the provisions of the Constitution, and is therefore null and void. All acts of the Legislature must be sustained by the courts, unless they are clearly and undoubtedly repugnant to the Constitution. The judiciary look to the acts of the Legislature with just respect, and reconciles them with the Constitution, and sustains them, if possible. In expounding a constitutional provision, such construction should be employed as will prevent any clause, sentence, or word from being superfluous, void, or insignificant. The thing to be sought is the thought expressed. Contemporaneous legislative construction is always considered of force. The Constitution, in express terms, having conferred upon the Legislature the power, by general law, to provide for more than two terms of the District Court in any county, the Legislature, in passing the act under consideration, has, we believe, kept within its constitutional limits.

The act which provides for five terms of the District

Court of Bexar County is not a " local " or " special " law, in the sense in which these terms are used in the Constitution. Said act is on a general subject, — the regulation of the courts, — which cannot be said to affect the welfare and interest of that district alone.

The Supreme Court of Maryland hold that, to make a statute a public law of general obligation, it is not necessary it should be equally applicable to all parts of the State; all that is required is, that it shall apply equally to all persons within the territorial limits described in the act. *The State* v. *County Commissioners of Baltimore*, 29 Md. 516. See also *Davis* v. *The State*, 2 Texas Ct. App. 425. And the Supreme Court of New York, in the case of *Williams* v. *The People*, 24 N. Y. 405, in speaking of an act entitled " An act in relation to police courts in the City of New York," — which, among other provisions, provided that a larceny from the person of another of property less in value than $25 might be punished as for grand larceny, — say : " It has, no doubt, features which savor of locality, for it punishes a well-known common-law offence more severely if committed under peculiar circumstances, within the limits of that city, than if committed elsewhere. But it prescribes the rule of conduct for all persons, whether residents of the city or any other part of the State, and its increased penalties are intended to protect residents of other localities equally with inhabitants of the city. * * * I cannot think that a statute having such consequences is to be classed with special provisions making appropriations for particular roads, public buildings, or the like, situated in particular local divisions."

And in the case of *Conner* v. *The Mayor of New York*, 1 Seld. 297, the question was, whether a statute passed December 10, 1847, in relation to the fees and compensation of certain officers in the city and county of New York, was void. The appellant claimed that it was void because passed in violation of art. 3, sect. 16, of the Constitution, which

provided that "no private or local bill * * * shall embrace more than one subject, and that shall be expressed in the title." We make the following extract from the opinion of the Court of Appeals of the State of New York in the case: "Is this act private, or local, in the sense of the constitutional provision under consideration? In my opinion, it is neither; but, being satisfied, for the reasons above given, that it embraces but one subject, I will only say that regulating the amount and manner of paying the officers, or any given number of the officers of a county of this State, for their official services, when such services are rendered in, and form part of, the administration and execution of the laws of this State, and affect equally the whole citizens thereof who come within their range, can neither be *private* nor *local* in the view contemplated by the Constitution."

The next question presented relates to the ruling of the court on defendant's motion to quash the special *venire facias* drawn in this case. The defendant moved to quash the special *venire facias:* "1. Because the jurors on said *venire facias* were not summoned according to law. 2. Because the said *venire* was not issued under a legal seal of the District Court of Bexar County, the legal seal containing the words, 'District Court of Bexar County,' and the seal under which said *venire* was issued contains the words, 'District Court, Bexar County.' 3. The defendant was not in court when said *venire* was drawn. 4. Because the copy of jurors purporting to be the *venire* drawn in this cause does not show, from the certificate of 'the clerk, that said jurors were drawn according to law."

As appears from the transcript before us, the clerk issued a writ of special *venire facias* for sixty jurors, to be summoned by the sheriff in this case. The writ of special *venire facias* for sixty jurors, giving their names, to be summoned by the sheriff as special jurors in this case, recites that they were selected according to law, and the

return of the sheriff thereon states that said writ was executed by summoning forty-three of the persons named therein in person or by written notice, whose names are given; and that he had delivered a true copy of the list of those summoned to the defendant.

It is difficult to perceive how defendant could have been prejudiced by the manner in which the jurors were summoned. Under our present jury system, whenever a special *venire* in a capital case is ordered, the names of all the persons selected by the jury-commissioners to do jury service for the term at which such *venire* is required are placed upon tickets of similar size and color of paper, and the tickets are placed in a box, which shall be well shaken up, and from this box the clerk, in the presence of the judge, in open court, shall draw the number of names required for the special *venire*, and the names of the persons so drawn shall be attached to the writ of special *venire facias*, and the persons so named shall be summoned by the sheriff, or other lawful officer, by virtue thereof. If the persons summoned on the *venire* were those drawn in the manner prescribed from the list of petit jurors, the officer summoning them could not be justly charged as " acting corruptly, in wilfully summoning persons upon the jury known to be prejudiced against the defendant, with a view to cause him to be convicted."

The sheriff, or his deputy, may serve those drawn by the jury-commissioners as petit jurors, by giving personal notice to each of the jurors, or by leaving a written notice at the juror's place of residence, with a member of his family over sixteen years old. See sects. 9, 25, chap. 76.

It would be the better practice in all capital cases for the sheriff, or his deputies, to summon in person all named in the writ, when this can be done.

The second ground in the motion to quash the *venire* is too technical. The impress of the seal upon the writ of

*venire facias* is a substantial compliance with the require-
ments of the law.   The seal under which the *venire* was
issued, by a proper grammatical construction, may be held
to contain all the necessary words required by the statute.
Pasc. Dig., art. 1411.

The defendant had no legal right to be in court when the
special *venire* was drawn.   This exact question has been
decided in the case of *Pocket* v. *The State*, 5 Texas Ct.
App. 552.

We believe the copy of the writ of special *venire facias*
sufficiently shows, in the absence of any thing to the con-
trary, that the names of the persons attached to it were
drawn according to law.

The ninth assignment is, that the court erred in causing
the defendant to be arraigned after the jury had been selected
and sworn to try the case.   As a question of practice,
this court has said that when an arraignment is required, it
should precede the commencement of the trial, and the
record should so state.   But when the record shows that
an arraignment was not neglected, but was had at an im-
proper time, as in this case, on that account alone the ver-
dict would not be disturbed.   *Smith* v. *The State*, 1 Texas
Ct. App. 408.

The charge of the court fully and fairly presented the
law of the case to the jury.   The prosecution relied entirely
on circumstantial evidence for a conviction.   We make the
following extracts from the charge of the court, to wit : —

"In order to warrant a conviction of a crime on circum-
stantial evidence, each fact necessary to the conclusion
sought to be established must be proved by competent
evidence, beyond a reasonable doubt ; all the facts necessary
to the conclusion must be consistent with each other, and
also must be consistent with the main facts sought to be
established.   In other words, the circumstances, taken to-
gether, must be of a nature to lead the mind with inevi-
table certainty to a satisfactory conclusion, — one pointing

to the accused as the person who engaged in the illegal act, and is guilty of the offence charged." &ast; &ast; &ast;

"The defendant is presumed to be innocent until his guilt shall be established by proof; and if you have a reasonable doubt of his guilt, you will give him the benefit of the doubt, and acquit him."

No exceptions were taken to the charge of the court, nor were any additional instructions asked by the defendant.

On the trial of the cause in the court below, on the application of defendant, the witnesses for the State were put under the rule. Subsequently, the State introduced M. R. Garcia, and thereupon defendant objected to said Garcia testifying, assigning as a reason therefor that said Garcia had been in the court-house, and had heard the testimony of John Trimble, which objection was overruled by the court; to which ruling defendant excepted, and tendered his bill of exceptions. The court, before signing the bill of exceptions, makes this explanation: "The witness Garcia was acting as deputy-sheriff at the time of the trial, and was in court guarding the defendant. He heard only a small portion of the testimony of John Trimble, upon matters foreign to the matters within his (Garcia's) knowledge; and as soon as the witness Garcia was discovered by the court, he was put under the rule, and there remained during the trial. There was, in fact, no violation of the rule. The presence of the witness in the court was an oversight for which no one is responsible, and no one was or could be prejudiced or harmed thereby."

The enforcement of the rule against witnesses is committed to the discretion of the judge presiding at the trial; and, in order to authorize a reversal upon a ruling of this character, it must appear that the defendant was injured thereby. The bill of exceptions fails to show this. *Ham* v. *The State*, 4 Texas Ct. App. 473, and authorities there cited.

The counsel for the State, on the trial, were allowed to prove by the witness McDaniel, over the objections of the

defendant, that he paid the deceased over $200 in money on the morning he left home for San Antonio, which was the day before his death. The evidence in the record shows conclusively that Robert Trimble was murdered on his way home from San Antonio. His dead body was found in Bexar County, with two severe stabs next the heart and a bullet hole through his clothing. The evidence of McDaniel, which was objected to, was admissible to show a motive for the murder.

The deceased left his home in Medina County on the 6th of July, 1877, for San Antonio, in a wagon, driving two mules, with a load of corn, intending to bring back family supplies. On the morning after the murder, his mules were seen in Medina County, near the home of the deceased. On the trial of the cause, the court permitted the State, over the objections of defendant, to prove that, on the night Robert Trimble is alleged to have been killed, there was a dance and music at the house of defendant's father, and that there was a wagon standing in the yard of defendant's father, without first proving that defendant was there, and that the wagon was the property of the deceased. Henry Rucker, a witness for the State, testified, among other things, as follows: "I saw a wagon at the house of old man Cordova, the Sunday night after Trimble was killed. * * * I heard music and dancing at the house of old man Cordova, and got up at twelve or one o'clock, and went out to look. From a light in the house, I could see a wagon near the house. Next morning all were gone from the house; the wagon also. There was nothing left in the house. There was no wagon at the house as I went home, at nine or ten o'clock that evening. The wagon I saw was a two-horse wagon." The State proved that defendant was seen on the 12th of July, 1877, three miles below the town of Uvalde, Uvalde County. There were then with him four other persons, — an old man and an old woman, who were his father and mother, and two boys. They were trav-

elling on the old Fort Inge Road, which is not a public road, though it is sometimes travelled. The defendant, the old man, and the old woman were in a wagon, which, though somewhat defaced, was proved to be the wagon Trimble was driving at the time he was killed. They were *en route* for Mexico. Defendant and those travelling with him were arrested by a party of Rangers, who were on the lookout for them. Signs of blood were seen about the wagon. After defendant and his party were arrested, they were started back to the town of Uvalde. Defendant shot two of the Rangers who had him in charge, and made his escape. He was subsequently captured in Mexico. The defendant attempted to prove on the trial that the wagon belonged to him; that he had purchased it a day or two before Trimble was killed. Under the circumstances, as shown from the testimony already before the jury, we think the evidence in regard to the wagon was competent testimony.

The acts of the defendant after his arrest, and while in custody, were properly admitted in evidence. In almost every criminal case, a portion of the evidence laid before the jury consists of the conduct of the accused, either before or after being charged with the offence; presented, not as a part of the *res gestœ* of the criminal act itself, but as indicative of a guilty mind. In weighing the effect of such evidence, Mr. Roscoe says, nothing more than ordinary caution is required. The best rule is for the jury to apply honestly their experience, and draw such inferences as experience indicates in matters of the gravest importance. Roscoe's Cr. Ev. 17, 19.

Again: it is complained that the court erred in hearing and determining defendant's motion for a new trial while the defendant was absent in jail, and without a waiver of his presence in court. The judgment-entry on the motion for new trial does not state, in so many words, either that the defendant was present or not present when the motion was heard; it merely recites that he appeared by attorney.

The clerk may have deemed it not a matter of sufficient importance to show that defendant was present, or the omission to state that he was present may have been the result of carelessness on the part of the clerk in entering the judgment; or we might indulge the presumption that the right of defendant to be present when his motion for a new trial was heard had been waived, inasmuch as the law gives an accused the privilege of waiving such right.    *Gibson* v. *The State*, 3 Texas Ct. App. 437 ; *Sweat* v. *The State*, 4 Texas Ct. App. 617.

Other questions were raised by the defendant during the progress of the trial which it would be, in our judgment, a useless consumption of time to discuss in this opinion. They relate principally to the rulings of the court in admission of evidence.

The defendant has not been represented in this court by counsel.  Feeling deeply impressed with the momentous issues involved, we have given the entire record before us a most careful and scrutinizing examination, and we find no error in it which would warrant us to reverse the judgment. When a criminal charge is to be proved on circumstantial evidence alone, the proof ought to be not only consistent with the prisoner's guilt, but inconsistent with any other reasonable hypothesis under the circumstances and facts proved.   We believe that the verdict and judgment are in accordance with the law and the evidence.   The judgment of the District Court is affirmed.

*Affirmed.*